Okay, well, anybody who's going to be arguing, let's step ahead and step forward. And your name? Good morning, Your Honors. I'm Leslie Rosen on behalf of the Plaintiffs Appellate. Good morning. Julie Tischer on behalf of St. Francis Hospital. Good morning. Steve Cologe on behalf of Dr. Kim. We've scheduled this case for half an hour. Since you folks have been here before, you know we like to engage and chat and talk about the issues. We're interested in all of these things, so we'll be talking probably more than a half an hour. But we do want to keep it within a relatively reasonable amount of time. Have you considered how you want to break this up? We have. We've discussed which arguments each of us will be addressing. I'll primarily be addressing the proximate cause argument on behalf of all defendants. I will be focusing on proximate cause as it pertains to Dr. Kim as well as jurisdictional argument. And just so the record is clear, we have a number of briefs and a number of defendants. We have one, two, three, four, five briefs. We have two lawyers. Are the other defendants' positions being represented here as well? Yes, they are. All right. With that, then, we will begin. Ms. Rosen, obviously, we hope to have a half an hour of an argument. I Thank you. Preliminarily, the court took a motion with the oral argument. There was a motion to strike two sentences out of my reply brief. And I'll just address that first to get it out of the way because I'm conceding the point. This is about the statement? Twice in my reply brief, I stated that Shekinah Johnson testified at her deposition that if she had been offered a c-section on November 5th, she would have taken it. In fact, that's inaccurate because she was never asked that question. I took that from Dr. Byrne's deposition when he was asked that. He was presented with that. And he said, yes, I know that. But in fact, it was not supported by Ms. Johnson's deposition testimony. She did, however, testify that she thought she would be having a c-section because Dr. Hidvegi had told her that might happen. And she had had two c-sections before. And I assume you can take as a given that had the question been answered, she certainly would have said she would have accepted it because That may be true. She didn't say that. Nobody ever asked the question. Okay. So we're just moving on. You don't have to consider that. You can ignore those two statements in my reply. Okay. So here we're basically on a summary judgment issue on proximate cause. And of course, everybody knows that proximate cause is typically a jury question. And my position is that this is nothing out of the typical case. It should have been a jury question as well. There is absolutely no question in this case that there were numerous deviations from the standard of care. That was never an issue in the summary judgment. And the primary overarching principle here is Dr. Byrd's testimony that every individual defendant had a duty to explain to Shekinah Johnson what was going on and that because she had had two prior c-sections, she was at extremely higher risk of having a ruptured uterus. The first breach you want to talk about is a duty to explain the high risk. That is the overarching deviation. So what evidence was there that the failure to explain the high risk pregnancy caused the injury? Dr. Byrd testified that had Shekinah Johnson known of this on November 5th, she should have known about it, you know, by the 24th week of, she should have known about it early on and by the 24th week of her pregnancy she should have been referred to a high risk pregnancy like this. Dr. Byrd testified that had she been aware of the situation, had all the risks and complications been explained to her, one of three things should have happened. And had any of those three things happened, the injury would have been averted. Number one, she could have been told on November 5th, look it, you've got these contractions you're having, they're regular, not consistently, they're not every two minutes, every five minutes, but you're having them and they're not going away. And the risk to you is not going into labor. That's not the problem, Harriet. Active labor. Let's talk about like lawyers and not doctors. How did the failure to explain to her that she was high risk cause the injury? She lost the opportunity to make a decision that could have saved her baby's life. If she had been told of the risk. So it was, you began with the fact that she never testified, as you said she did in your testimony, that had she been given the option of a C-section, she would have taken it. On November 5th, that's the only thing. She was expecting a C-section. There is no dispute about that. Just on that one day. So you said that's what she said, but that's not what she said. So you're saying the main breach is a duty to explain the high risk. And I'm asking you three times. And the complications. What is the causation? How is that related to what happened? If she. You're saying that if she had been told she was high risk, she would have asked for a C-section? Is that the causation? Not that she would have asked for it. But the doctor would have explained the situation to her. And said, look, you're high risk. You're having contractions. We could do a C-section today. Because you're at term. You're 38 weeks. It's not a breach of the standard of care to let her go home. No. But it was a breach of the standard of care to let her go home without understanding the situation. What is the causation? Because if she had. First of all, she might not have gone home. But if she had gone home, they would have. The standard of care required her to understand that if the contractions continue, she had to get her little butt back. Is that what happened? No. Not until it was terrible. The contractions. There's no evidence, actually. The contractions continued on November 6th. And nothing ever stopped. You're adding that the doctors were supposed to. Show me where Dr. Bird said that because the contractions continued, that caused. He said. It's actually the other side of that. There's no evidence here that it was within the standard of care to do a C-section before the rupture. Correct? There's no evidence. It would have been within the standard of care to do it. Absolutely. It was a deviation from the standard of care not to do the C-section before the rupture. There's evidence of that? That's the testimony. It was a breach not to do a C-section before the burst. Yes. Dr. Bird testifies to it numerous times. I don't have the actual record itself. So if you go to his deposition. I'm sorry. He says repeatedly, and I'll get the pages, that the standard of care required very, very close observation. This is page 126. That's observation. That's not performing the C-section. And everyone is on the same page, meaning that if Shekinah knew she was very high risk and that if she had any problems, any contractions, she should notify Dr. Treat or his partners and evaluate her appropriately every other day or maybe every third day. Not every two weeks. If she had, if Dr. Treat had seen her on the 5th, the outcome would have been different. Dr. Bird testifies. Did he say Dr. Treat should, it was required of Dr. Treat on November 5th, had he seen her to perform a C-section before the rupture? Before the rupture, yes. He didn't have to perform it. Show me where he says that. He says not that she had to do it on that day, but he had to do it before the rupture. And if she had been managed properly, it would have been because.  Well, one of three things he says would have happened. Wait, wait, let's slow down. He just read to me, he said had she been referred to the Hays Group, Dr. Treat would have seen her and he had some options. One of them was closely monitoring her. One of them was monitoring her every perhaps three days, which we know would mean past the day of the rupture. What evidence do you have that any breach by any of these doctors caused her to not have an intervention before the burst? Even Dr. Hidvegi testifies to that in his deposition. In Dr. Hidvegi's deposition, at the very end on page 114 of his deposition, Ms. Klein asks him, she says, is there anything that Shekinah Johnson herself did that caused this? And he answers, well, she should have had routine prenatal care. Why? And it says at page 114, because if she had routine prenatal care, she would have been seen in the last four weeks by the Hays Group, those are doctors who were competent and able to deliver her child without it rupturing, and they would have made arrangements for the management of the patient. The doctors would have made arrangements for the management of the patient. Let me ask you about, can you concede that the only way this injury could have been avoided is if there had been a C-section done before the rupture? Absolutely. All right. So where is there evidence that a breach caused that? If she, Dr. Byrd testifies, and I'll have to get the page for my reply because I can't go through this in my brief right now, that if she had been seen by the right doctors, they either would have done the C-section then, they would have said, let's not go through this, you know, why push it, let's do it, we can do it now. She could have said yes, or she could have said, if you want to do a VBAC, which is trying to have a vaginal delivery despite the fact that you've had two C-sections already because you've had a failure to progress in labor, we can watch you, because they could have monitored her and seen if, and gotten to her, taken care of her before the rupture. And didn't the doc, didn't your expert say that either one of those was in the standard of care? There were like three or four, several, three possible things, none of which was a standard of care? Isn't that what he said? No. He said, you could do this, she could have done this, you could have done this, she could have done this. Three things. Just three. There were three things. The C-section on the 5th, the close monitoring in the hospital. One of them was, go home. Go home. Go home with the understanding that if these contractions continue, you've got to get back because we have to watch you closely because you can rupture, and we want to get to you before you rupture. That's the point. And I wanted... Let's be real precise because I really get the feeling that this moves around real fast. So we know it was not a deviation of standard of care not to do a C-section, right? On the 5th is everything, if, if, if... Go home is fine. If, no, it was... Go home is fine. No. Go home is not fine? Only if she had been properly monitored, which she wasn't on the 5th. She was monitored at St. Francis for 45 minutes and Dr. Byrd testified that was a deviation because she should have been monitored for three hours. I don't want to talk about that. Then he says, he also said he had Dr. Coupe evaluated and monitored Johnson for the additional time, and had the cervix remained closed and had the contraction pattern remained irregular, Dr. Coupe would have complied with standard of care when he sent her home. If, if he had seen her, examined her, and monitored her for three hours... Then he would have been within the standard of care to send her home. If everything looked okay. But we don't know if everything looked okay because there were those deviations. It would have been. All that Dr. Byrd ever said, and you, and, Your Honor, I saw you at a seminar a few weeks ago where you said testify, you said in the seminar, you tear this record apart, you read it carefully. I know you do. You read Dr. Byrd's testimony and his deposition very carefully. They are throwing hypotheticals at him and they are tearing... I've read them apart three times. Okay? So I'm not surprised. I know the record. I told you I read the record. Guess what? You really do read the record. I know what Dr. Byrd said. So I'm asking where did he say that if she, let's see, you're focusing now on that the whole idea that she had to be explained was high risk. Yes. And that, when, that it was within the standard of care to say go home. If she had been okay, it was within the standard of care. If she, if the proper monitoring had shown that she was fine, then it would have been within the standard of care to send her home assuming they explained to her, look it, you've got a very high risk of rupturing. This is what it's from. It's not from going into labor. It's just the contractions. So if these contractions continue, come back. Isn't that what happened? No. Why? Because the contractions never stopped. They continued. There's no showing... Which the doctor said, here's how she presented. Made it erect and Hicks, whatever it was, she was not in labor. Dr. Byrd eventually says that he agrees she was not in labor. So... Active labor. Active labor. And then go home. And if anything, and you say, the standard of care required them to say, if anything changes, come to the hospital. I didn't say anything changes. Then nothing changed. I said... And when it did, she went to the hospital. I said if... How did this cause the injury? If... I didn't say if anything changes. Go home. If the contractions continue, come back. Did he say that? Where does he say that? On page 13 of my brief, I quote, Dr. Byrd, Ingalls asked, when I said the opinions were speculative, he said, the standard of care would have required that she had very close observation, number one. Number two, the standard of care would require that everybody is on the same page and that she, the patient, irrespective of her background or education, et cetera, was completely aware and cognizant of the fact that she was very high risk. And if she had any problems, any contractions, not any extreme contractions, not regular contractions, not painful contractions, she should notify Dr. Treat or one of his partners. And the standard of care, of course, then would be to have her evaluated appropriately. There is no showing that her contractions ever stopped, that she had contractions on the 5th, she had them on the 6th, and then on the 7th, she ruptured at home. Those were, she said, presumably, she ruptured before that because she said, I've had two other babies. I know what contractions are. This wasn't like that. This was excruciating, painful, horrible. Horrible, horrific, I believe. Those were not contractions. That was the rupture. She was, she shouldn't have been home all that time without checking in, without somebody telling her that she should do something. She shouldn't have been there. She should have been at the hospital on the monitor at that point because the contractions never stopped. And she was deprived of the opportunity of having this taken care of before it ruptured by not knowing that. It wasn't active labor. Defendants keep hounding. Active labor. Her cervix was closed. Her cervix was closed when they delivered her, most likely. There's no showing of anything else except there's some controversy about whether they were able to active labor, ever. That wasn't active labor at the house. That was the rupture. So if she had been advised, she could have done that. And even, I mean, even Dr. If she was advised that, let's be real precise, if she had been advised that what you are having now continues for 12 hours, you should come back. Maybe. It continues. There's no time frame. What did he say? What did he say? What is the time frame? He just says, and if she It's within the state of care to say go home. Okay? You're saying there's something else they should have done and that's what caused the injury. And you say it's they should have told her what? It says here on page 13 of Supplemental Record Volume 1, C-13. And if she had any problems, any contractions, any contractions, she was having contractions. They never said to her, look it, you know, you're at a higher risk. So when she had a problem, she did cough, obviously. So you're saying she was told if you are having contractions, was she having contractions when she saw the doctors? Yes. And then Okay. Yes, she was. It's within the standard of care to say while you're having contractions, go home. As long as you understand that, you know, if she was having contractions, they last about an hour and stop for about seven hours. Dr. Burns said they could have sent her home if under that condition and seen her the next day or the day after. The next day, most likely very close observation. There were three things that could have been done and none of them were done. And they deprived her of the opportunity to have a healthy baby. Baby was found in her abdomen. It's ridiculous. There's no reason for that. Even Dr. Hidvegi says if she had had the proper care, this would not have happened. That's at page 114 of his deposition. And I think that's the most telling when the defendant doctor even says that. It doesn't say, they weren't supposed to say there are 12 hours of contractions, come back. It was one of three choices. They may have convinced her to have it on the fifth. That would have been within the standard of care. But he was broad. He gave three choices would have been okay. None of them happened. Nobody ever said to her, look it, buddy, you know, you're, you know, you could have a big problem here because you're at a great risk for uterine rupture. He never, Dr. Hidvegi never even should have been treating her because she was at such high risk. She should have been sent to the Hays Group much earlier on. But, you know, he said, well, I wasn't going to deliver the baby. She knew that. No. She thought he was delivering her baby. She told that to the people at St. Francis and she told that to Ingalls when she came back on the 20th, I mean on the 7th when she was in the registration for 20 minutes. She said, Dr. Hidvegi is going to deliver my baby. She was never told that this guy could not do it. Dr. Kim was also a member of Lincoln. He worked there. And he, this was Lincoln's own policy. Own policy. Not let this guy see people when they're, you know, in their last month of pregnancy. He wasn't capable of delivering the baby and he really screwed up royally by not explaining to her what the situation was and what she had to know. She was completely deprived of an opportunity. So I think we could go round and round on this, but I think I've pretty much answered it to the best of my ability. It's page 13 of my brief. And so the question becomes, well, what happens when there is a tort of omission instead of commission? And I think that's what, you know, what hung the judge up below. Because you could never say with absolute certainty what would have happened had this been, had she been given the information. And in fact, you know, she was, obviously when you read her death, you can tell she's graduated from high school, but she's not the smartest young woman. And she really wasn't very clear about much of her testimony. And it would have taken a lot to explain to her, but they should have explained to her. Can we look at the cases that you rely on? All of them seem to have the same pattern in a paragraph. I think it's the baby one. Northern Trust v. University of Chicago is my very best case. In that one, Dr. Fields testified, again to a reasonable degree of medical certainty, that had the monitor been attached at 3.30, it's more likely or not, it would have shown the heartbeat was abnormal, prompting the decision to perform a cesarean section before the brain damage occurred at 4.30. So each one of these cases has something that's saying if the doctors had done so-and-so, then they would have seen that they had to have some kind of intervention before the injury occurred. If they put on the monitor, they would have seen there was a problem. They would have done a c-section, and there would have been no brain damage. That's what Northern Trust does. Each one of your cases has that pattern. If the doctors had done this, they would have seen this problem, they would have acted before the damage took place. And that's what our case is. Show me that pattern in this case. First of all, going back to the Northern case, before I get to that, there's nothing in the Northern case that the expert couldn't say for a fact, because you never could say this in an act of omission, that had they seen it, and they'd done the fetal monitoring at 3.30, they would have seen the abnormal, and they would have done the c-section in what would have been done, not what would have been done, because the resident there could have made a mistake, could have not seen it, could have said, we have time. Anything could have happened. And that's why I think it's most like our case. In our case, if they had complied with the standard of care, if she had been seen by doctors who were appropriate, if she had been seen by the Hays Group in her last month of pregnancy, and they had complied with the standard of care, they would have told her, okay, Shakina, we got some choices here. You are probably going to need a c-section, because you've had two before, but if you want to try a VBAC, we're going to monitor you very, very closely, and we can pick a way to do that. You know, we can either do that in the hospital, or you can go home a little bit and come back. But that never happened. So that is why. It's the same. She was deprived of that opportunity. You can't say for sure. Your doctor said it was within the standard of care to say go home. So unlike these other cases, it was only within the standard of care to let her go home with the complete knowledge of what going home meant and when she had to come back. They never gave her that. She was deprived. If they had given her that, she was expecting a c-section. There was no reason to think she wouldn't have come back. There's no evidence that she wouldn't have come back. The only evidence was that she went home from St. Francis. They referred her back from St. Francis and said go back to Dr. Hidvegi. Wrong. And she had an appointment with Dr. Hidvegi for later on. Nobody said to her, Shekina, watch out. Watch out. We should have watched her. She never had the ultrasound even that Dr. Hidvegi wanted her to have. And Dr. Hidvegi testified that perhaps an astute person doing, a technician doing the ultrasound would have detected. You can't say what would have happened because it didn't happen. But sending her home, I mean, that seems to be the crux of this case. That if they let her go home, that was it. They had to let her go home with full understanding of what the situation was. And he didn't just say, Ah, you can send her home. Go home. Nobody said that. Go home with the understanding that maybe the contractions would have stopped after 45 minutes only if they had properly monitored her for three hours. Maybe they would have seen that the contractions never stopped. And if that had happened, then maybe it wouldn't have been okay to send her home. But we don't have that because they only monitor her for 45 minutes. And the contractions were mild to moderate during that time. They never stopped. As Dr. Bird said, some people, you know, are having serious contractions and smiling and some people are having light contractions and crying. You don't know. But they didn't monitor her. And that hypothetical about going home was contingent upon proper evaluation, which never happened here. You don't know. Maybe someone should have asked Dr. Bird, well, Dr. Bird, if they had monitored her for the three hours like they should have and the contractions would have continued, you know, intermittently for those three hours, would your opinion change? And maybe he would have said, yes, I think so. But nobody asked that question. So there's no evidence of that? With summary judgment? And that's what we're going around and around about? What evidence is there at this point? But the evidence is that he said it was only okay to send her home if they had explained it. She would have come back if she had a problem. Or contractions. Not a problem and not a problem with contractions. It says a problem or contractions. So that's the key. She was having contractions. Nobody said otherwise. Never. So I think I can move on at this point from the proximate cause. The other issues I think are small. The jurisdiction issue. You know, St. Francis had filed a motion to dismiss this case for lack of jurisdiction after the briefs were pending before the oral argument was set. And the court denied that motion. And the basis of that denial was that they participated in this case for five years without briefing about it. The complaint was filed, I believe, on October 15th. And before anybody was served two and a half weeks later, an amended complaint was filed. It would have been a routine motion, presumably, if it had been filed. And I'm not saying it was or wasn't. The record doesn't show that it was filed. And the case went on for five years. There's no Illinois Supreme Court case that says that that's automatically a basis for dismissing it. And indeed, the most recent case suggests that it would be wrong to dismiss a case in a situation like that where there's no complaint about it. There's active participation for five years. The cases they cite don't help them at all. And most significantly, the Prohaskis case, where it's from the Second District, as soon as the defendants were brought into the case after the statute of limitations had expired, they filed a motion to dismiss. And that's the way to behave. That's the way to act if you're concerned about it. But in this case, there was never any complaint about it. And the same thing goes on Dr. Kim's statute of limitations defense. He never raised an affirmative defense on statute of limitations. So I don't see how that would have been. That's appropriate at this point now. Finally, Dr. Kim argues that Dr. Bird wasn't qualified. Although he says he's not going to argue that. He wasn't qualified to give opinions against him. That was denied in the case. And as an abuse of discretion standard, as opposed to de novo, which we have on summary judgment, Dr. Bird testified that he worked with family practice residents who rotated through the labor and delivery part of the Evanston Hospital and that he was familiar with them. So I don't think there's any merit to that argument either. And with that, I'll turn it over to you, Mr. Chairman. May it please the Court, Counsel. Let me pick up where my opponent left off with the jurisdictional point. Cases are quite clear that a jurisdictional issue cannot be waived and may be raised for an appeal. And in fact, Callahan paving and Stichoff, this Court's decisions, say that very thing. It is undisputed in this case, and Counsel just conceded, that there was no, that the record shows, no leave of court given for the plaintiff to amend the complaint to add his defendants, Dr. Kim, Dr. Hidvegi, Lincoln Medical Center, or St. Francis Hospital in the 2003 action. Callahan paving, Stichoff, and Peska, which is a 2007 decision. When did you become aware of the fact that there had never been a leave, requesting leave of court to file this amended complaint? I became aware of that fact in reviewing the record on appeal. So for five years, six years, whatever, everybody's just moving along, singing a song, and nobody's ever been aware that there was never a leave of court sought to amend the complaint. As far as your claim is. As far as I can see, that is correct. However, as Counsel pointed out, the amendment was made before any defendants were served. Be that as it may, Callahan paving and Stichoff squarely hold that there can be no waiver of this issue. In fact, in Callahan paving It's interesting. I actually did a chart of Callahan, Stichoff, and whatever, and tried to relate them back to the cases that the Supreme Court found unpersuasive in Reagan. And they're all there. I mean, the cases that the Supreme Court rejects, Green, Torley, Glickoff, all rely on the same cases you're arguing towards now. So the Supreme Court wasn't persuaded. Why should we be persuaded? Well, I assume, Justice, that you're referring to the Reagan case. And there is a critical distinction there in that Reagan involved an amendment to add claims against parties that were already properly joined as defendants. And the Court made that distinguishment between the other cases. Why does it make a difference? It makes a difference, Your Honor, because in 2007, almost 10 years after Reagan, this Court decided PESCA and made a point of discussing at length the Stichoff and Callahan paving cases for the same proposition that I'm arguing here. Other than the fact that these cases have said it over and over again. Explain to me the rationale. Why does it make a difference? What's the difference between adding a claim and adding a party? That is a question that does not become apparent, I would concede, from the cases themselves. However, the analysis seems to be that if you look at the Code, Section 2407 states that parties may be joined upon order of court. And I would suggest that that provides a basis for the Court's holding in Stichoff and Callahan paving. Now, let's talk about jurisdiction for a minute. Yes. Jurisdiction usually means the authority of the Court, correct? Yes. And generally, we break that down into subject matter jurisdiction and personal jurisdiction, correct? Yes. Okay. The Circuit Court, do you think, has subject matter jurisdiction over this negligence count? Yes. Okay. Then, what we're talking about, then, is personal jurisdiction? Is that the concern? That is what it appears from the case law. Okay. So, don't we have a whole line of cases that, if you participate in the case, that you do, in fact, waive any objections? And you are submitting yourself to the jurisdiction of the Court? I understand where you're going, but let me answer it this way. What the cases hold is that the complaint filed without leave of court is a legal nullity. Why though? Why? And, therefore, Justice, I cannot get inside the mind of the Court in so holding other than what I've proffered, which is Section 407 provides upon leave of court parties may be added. That was not done here. And that jibes perfectly with the holding in PESCA. So it doesn't make any sense. I mean, that's what courts have been saying for years, but you kind of agree with me it doesn't make any sense. Perhaps not, but it is the law of this district. And the plaintiff has not argued that those cases were incorrectly decided or that they should be overruled. There's no authority for doing so. And this Court decided to There are some cases that are pushing back against this nonsensical rule that you and I disagree doesn't make any sense. Right? There are some cases that are starting to question why do we keep saying something that's not based on any kind of rationale? Plaintiff cites the Fourth District case, and that does suggest that. If this is a rule that makes no sense, why should we keep on quoting it? Stare decisis is the answer to that. That is the law of this district, that the complaint filed without leave of court is a legal nullity as to the newly added defendants. And that is what happened here. Has the Supreme Court ever said, despite the fact this is a nonsensical rule, we should re-adopt it? Or are they backing off of this on Reagan? Well, I In Reagan they're saying, you know, yes, there are all these cases. I mean, they cite all these cases that just over and over again say, jurisdictional, jurisdictional, jurisdictional. And then the Supreme Court says, we're not persuaded by those. But they also did not overrule those cases. And those the Supreme Court was not dealing with the issue presented here. It was dealing with the addition of claims against properly joined defendants. I think that is a key distinction to be made here. Why? And I'll stop asking questions. Why do you think it's different? Why are claims different from parties? Subject matter jurisdiction, personal jurisdiction, why is there a difference? There is a difference because the Court has said there is a difference. And that is the law that is binding on the parties in this case. This Court three years ago decided the Peska case and held to that principle. I cannot explain any further than I have the rationale for those cases, but they are the law and they hold that this complaint, this amended complaint is a legal nullity with respect to the newly added defendants. That provides a basis for the Court to affirm the trial court in this case. And with respect to Dr. Kim, there is a different procedural posture given the voluntary dismissal, as I've argued in the brief. And that I've cited Babel v. Kavanis for the proposition that the null complaint with respect to Dr. Kim in the 2003 case could not toll the statute of limitations under Section 13217. And therefore, the first properly filed action against Dr. Kim was filed more than four years after the statute of limitations. And as to the waiver argument, the statute of limitations was raised by Dr. Kim in the 2006 case in his first motion for summary judgment. So there was no waiver of that issue. And even if there had been, waiver is a limitation on the parties and not the Court. And that is a basis supported by the record for affirmance. Let me move on to proximate cause then, unless you have any further questions about this issue. Dr. Kim was not mentioned by counsel in her argument with respect to proximate cause. He is on a different procedural footing than the rest of the defendants. What is undisputed in this case is that Dr. Kim saw Ms. Johnson one time on November 1st, six days before the uterine rupture. Dr. Byrd's testimony is undisputed. The plaintiff did not require admission to the hospital for delivery on November 1st. She did not require immediate referral to a delivering obstetrician on November 1st. Dr. Kim was not negligent in sending the plaintiff home on November 1st, and he had no duty to follow up to see if she needed an obstetrician. And he did, in fact, refer the plaintiff to an obstetrician, Dr. Hidvegi. It's further undisputed, and the plaintiff herself testified that she underwent no change in her physical condition between November 1, 2001, and November 5, 2005, when she was seen by Dr. Hidvegi. She also testified she had no change in her physical condition between November 5, 2005, when she was sent home, and 4 a.m. on November 7, when she began having the intense pain. Dr. Byrd testified, as you pointed out, Justice Tice, that the standard of care did not require an immediate C-section on November 5, 2001. The sole claim against Dr. Kim is that he was negligent by failing to refer this plaintiff to an obstetrician who had delivery privileges. But Dr. Byrd conceded that had she been seen by an obstetrician with delivery privileges, Dr. Threat, he's not a swami, and he doesn't know what would have happened. This case is very analogous to your opinion, Justice Tice, in Kravonic v. Abramowitz. In that case, the defendant referred the plaintiff back to his regular treating cardiologist. The plaintiff went back two months later to that obstetrician, and then subsequent to seeing his regular cardiologist, a month later had a heart attack. The court held there was no evidence in that case that the first cardiologist, the defendant, seeing the plaintiff, his failure to do anything deprived the regular treating cardiologist of any information he needed to properly treat and diagnose the plaintiff. Similarly here, there is no evidence in Kravonic that there was any change in the plaintiff's condition between the time she saw the defendant and subsequently saw her regular treating cardiologist. Just as here, there is no change in her condition between the time she sees Dr. Kim on November 1 and the time she sees Dr. Hidvegi on November 5. Now, under the circumstances, the plaintiff's case, I think Kravonic is dispositive. There is nothing but pure speculation with respect to proximate cause as it relates to Dr. Kim. I suggest that as it relates to all the defendants, and my co-counsel will address that, but with respect to Dr. Kim, we are even more removed from causation with him than was the case in Kravonic, because in that case, you had a cardiologist, the same practice doctor, who is being criticized not for referring her to an obstetrician, but for apparently referring her to the wrong kind of obstetrician. And there is no testimony establishing how that made any difference in the outcome. In fact, Dr. Byrd conceded that he didn't know. I would like to briefly address the issue with respect to Lincoln Medical. That wasn't raised by the plaintiff's counsel, but since I am speaking on behalf of Lincoln Medical, the plaintiff in her brief, I think erroneously stated the standard of review on that issue is de novo. It's not. What she has challenged is the trial court denying her motion to default Lincoln Medical after summary judgment had been given to the other defendants, and then allowing Lincoln Medical to join in those motions as its response to pleading, and then subsequently granting summary judgment. The plaintiff hasn't challenged the summary judgment with respect to Lincoln Medical on any other grounds than the same grounds for all the other defendants, which makes perfect sense because Lincoln Medical was sued on a vicarious liability theory. If summary judgment was proper for the alleged agents, it would ipso facto be proper for the alleged principal. So the question is, did the trial court abuse its discretion in allowing Lincoln Medical to file a response of pleading late? And that is an abuse of discretion standard, which means no reasonable person would take the view of the trial court. The trial court had already ruled that summary judgment was appropriate for all of the alleged agents. Allowing Lincoln Medical to file a joinder in those motions was not an unreasonable act. Had the trial court granted a motion for default, Lincoln Medical could have brought a motion to vacate that default, which could have been granted. They could have filed an answer and brought their own summary judgment motion later. It would have made no difference to the outcome. If summary judgment was appropriate for the alleged agents, it was appropriate for Lincoln Medical. Any else? I think not, unless the court has any questions. I'll pass to my co-counsel. Thank you. Thank you. Good morning, again. The court has honed in on the single specific issue with respect to proximate cause in this case. Dr. Byrd at no point in his deposition said that the standard of care required a caesarean section at any time between the time she was seen on November 5th, 2001, and the time of this event on November 7th at 4 a.m. His admission that the standard of care didn't require a caesarean section is devastating to plaintiffs' case on the proximate causation issue. It is the only option that Dr. Byrd offered that might have prevented the outcome here. And by Dr. Byrd's repeated admissions, that particular option was not required by the standard of care. The other options articulated by Dr. Byrd, as you've honed in on, wouldn't have made a difference in this case. By close observation, he said it would have been sufficient to see this woman in two days, in three days, or weekly. All of that would have occurred after the event in question. He said he could have performed a caesarean section, although the standard of care didn't require it, and if he had scheduled it for November 10th or November 12th, that would have been within the standard. Again, that wouldn't have prevented the injuries here. Why does he say the standard of care did not require a caesarean section on November 5th? He says because the patient's cervix is closed, because there's nothing but evidence of very irregular contractions on the fetal monitor, and because the baby was not in distress. Those facts continued from the time this patient was seen on November 5th until the time of this event on November 7th. When she arrives at Ingalls on November 7th at 5.15 in the morning, her cervix is closed, but she's then having severe contractions. Plaintiff testified herself, plaintiff suggested otherwise, but Ms. Johnson in her deposition, and I believe it's at page 1491 of the record, excuse me, 1291 of the record, Ms. Johnson testified specifically that her contractions had not changed since November 5th, had not gotten more regular until she experienced that severe pain at 4 a.m. on November 7th. Dr. Bird opined that there was a duty to explain to her the high risk nature of her pregnancy. Let's be honest, this is about as high risk as you can get, and this young girl was kind of shuffled around among a lot of people, and this feeling that a lot of other young women would have been treated very differently, this kind of high risk kind of pregnancy. But no one impressed upon her the danger that she was in and her baby was in. That's the allegation here. The quotation from the doctor is something I don't have it directly in front of me, but duty to explain that she needed to come back in if she had problems or if she continued contractions. Is that correct? No, I don't think so. I think his testimony is that she should have, in fact, come back in if she had problems or if she continued contractions. But he also said that the nature of the contractions that she had on November 5th didn't require a cesarean section. In other words, he concedes, he knows those fetal monitor strips on November 5th showed irregular contractions. Nurse Bell described them as Braxton Hicks. The patient didn't report the contractions on November 5th. She was advised of that by the nurse at St. Francis who said, you know, the strips show that you've got some contractions, they're mild to moderate, they're not frequent. And Dr. Byrd concedes that that evidence, and he says it three times in his deposition, given that fact pattern, the standard of care did not require a cesarean section. And we have no evidence. But did the standard of care require someone to say to her, you are very high risk, you must return if X, Y, and Z occurs? Yes. Does he say something like that? Yes, he did say something like that. His X, Y, and Z is where you should tell her that if she has contractions, she is at risk of a uterine rupture if those contractions continue and become severe. And then what happens is we have a complete absence of factual foundation for that opinion. Plaintiff herself says nothing changed. I went home November 5th. On November 6th I stayed at home with my family. And it wasn't until November 7th at 4 a.m. that these contractions increased in frequency and in severity. And by Dr. Byrd's own admission, that fact pattern did not require a cesarean section under the standard of care. So that particular deviation that they should have told her all these things still lacks the necessary element of proximate cause. There's no indication that the condition that would have demanded that treatment existed. In fact, the facts exist that it didn't exist to support that opinion. So under all of Dr. Byrd's other options, there's no proof of proximate cause. Once he takes a cesarean section out of the equation as necessary under the standard of care, the rest of it all becomes irrelevant. The rest of it wouldn't help this patient at all. And he takes the cesarean section completely out of the equation. He doesn't know what Dr. Threat would have done. He gives Dr. Threat these same options. So with respect to all of the defendants, there's no proof of proximate cause. There's no proof that anything they did or didn't do resulted in this unfortunate outcome. I could talk about the cases cited by plaintiffs, but as Justice Tice described, all of those do nothing but prove up the deficiencies in each of those cases that plaintiff relies on. There was either an abnormal finding that warranted intervention or a finding that was misdiagnosed. We don't have that here. We have a lady who came in for a checkup, was sent for fetal monitoring because Dr. Hidvegi couldn't hear the fetal heart rate. She's not in labor. It's a regular appointment. She's having no difficulties. She comes to St. Francis Hospital. The fetal monitor shows that the baby's doing beautifully. The fetal heart rate is just what's expected. It shows variable decelerations. The mother is advised everything looks good. We've heard the fetal heart rate. You're fine. This isn't a situation where she came in in pain, where she came in saying I'm contracting. I'm in labor. They sent her home, which according to Dr. Byrd was appropriate and within the standard of care. So plaintiff has completely failed to provide this court or the trial court with any evidence on the proximate cause issue. With respect to Ingalls, they're another step removed as well, since I'm here arguing on behalf of all defendants. Ingalls sent the patient to St. Francis, at which point everything was done that Dr. Byrd said should or could have been done. So they're even a step removed from St. Francis and from Dr. Hidvegi. I think this case is very similar to the Wiedenbeck case where this court determined the summary judgment in favor of the defendant should be affirmed. In fact, I think the Wiedenbeck case was stronger because in Wiedenbeck there was an abnormal finding. That was the case I believe where the lady called complaining of a severe headache and there was a delay. She called again the next day. I still have a severe headache and now I'm vomiting. The doctor said, well, just rest at home. Later that night she goes to the emergency room. A CT scan of the brain is performed and she's diagnosed with a brain cyst. But the expert in that case couldn't say that a CT scan on the first complaint would have revealed any injury to the brain and couldn't say if there was an injury what the treatment would have been. Here we don't even have that initial complaint. We don't have Dr. Hidvegi saying if this had been done, this would have been demonstrated, it would have demanded this treatment. We simply don't have that here. So I would suggest to the court that the trial court got this right in the first instance. There is no evidence of proximate cause. Plaintiff never said I would have had a septicee section if one were offered to me. Plaintiff never said my condition changed between November 5th and November 7th. We have to live with the record. We can't live with what we wish the record showed. And the record shows that Dr. Byrd wasn't able to link any deviation to this injury. So I'd ask that this court affirm the summary judgment on behalf of all defendants. Thank you. Ms. Muldoon. Dr. Byrd did testify more specifically. I have found the site and it's in both my opening brief and my reply brief. My opening brief at page 10, I say, in Dr. Byrd's opinion, if the defendants had followed the standard of care, plaintiff would either remain in the hospital for observation or been told to return to the hospital the next day for close observation. So the next day would have been    more on page 4. Counsel, I believe for St. Francis is making up a hypothetical there. Yes. And I'm just going to read it. If we assume that Dr. Treat saw Ms. Johnson on November 5th and did an evaluation and was concerned about whether he could hear fetal heart tones, so we instructed Ms. Johnson, he meant Dr. Habeke, so we instructed Ms. Johnson to go to Ingalls, be placed on a monitor.  considered to be the most common cause of heart failure in the is confirmed as it was at St. Francis. The contraction pattern revealed at Ingalls is similar to the contraction pattern at St. Francis, and despite several hours of monitoring, does not change. And during vaginal examinations, Dr. Treat determined that the cervix was closed. Do you agree that Dr. Treat would have complied with the standard of care if he had had his discussion with Ms. Johnson about what type of delivery she wants? Set the C-section for either November 10th or November 12th, as you testified last time and sent her home. Then there's a lot of colloquy about it, and Dr. Byrd answers. My answer to your question would be, it would be within the standard of care, if all what you said was true, for him to do one of three things, perform C-section then and there, two, after thorough instructions to the patient, let her go home, probably see her the next day, if nothing has changed, or admit her to the hospital for continued observation. None of this, of course, ever happened because he didn't see the patient. That would be the answer, standard of care-wise, to your hypothetical question about Dr. Treat had seen her the next day. Not wait, but the next day. And if he had seen her the next day, there would have been yet another opportunity to save the baby, which never happened. I just want to point out, counsel misspoke. Dr. Byrd never says return if the contractions become severe. That's not so. And this hypothetical that I just read you, that question and answer, that still assumes proper monitoring, which never happened here. There was no three hours, there was no vaginal exam by anybody, there was no doctor looking at her at all, just a nurse. And Dr. Byrd never said return if the contractions became severe. And you can't say that everything, as to Ingalls, everything that Dr. Hidvagi ordered was done, not true. Dr. Hidvagi wanted monitoring because he couldn't hear heart tones, and he wanted an ultrasound. The ultrasound, he said, maybe not if everything was okay, but there was never a determination that everything was okay. I don't think this record bears out any finding based on a 45-minute fetal monitor strip of a woman with two C-section problems, and a woman with two prior C-sections, and no doctor seeing her and no examination that everything was okay. Dr. Byrd never really said that. Every time he was forced into something like that, it was based on a hypothetical that never happened. So also he says, that's it. Thank you. Thank you very much.